No. 13-1603(L)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
_____

CONSOLIDATION COAL COMPANY
*Plaintiff — Appellant*
v.
GEORGIA POWER COMPANY
*Defendant — Appellee*
and
DUKE ENERGY PROGRESS, INC., Progress Energy Carolinas, Inc.
*Plaintiff*
and
PCS PHOSPHATE COMPANY, INCORPORATED et al.
*Defendant — Appellant*
and
BARNES & POWELL ELECTRICAL COMPANY, INC. et al.
*Third Party Defendants*
_____

**On Appeal from the United States District Court for the Eastern District of North Carolina, Western Division, Louise W. Flanagan, District Judge**
_____

**PRINCIPAL PAGE-PROOF BRIEF OF APPELLANTS CONSOLIDATION COAL COMPANY AND PCS PHOSPHATE COMPANY, INC.**
_____

| | |
|---|---|
| Daniel M. Darragh | Brian J. Murray |
| Julie W. Vanneman | JONES DAY |
| COHEN & GRIGSBY, P.C. | 77 West Wacker Drive Suite 3500 |
| 625 Liberty Avenue | Chicago, IL  60601 |
| Pittsburgh, PA  15222 | (312) 269-1570 |
| (412) 297-4900 | bjmurray@jonesday.com |
| ddarragh@cohenlaw.com | |
| jvanneman@cohenlaw.com | Michael H. Ginsberg |
| | Mary Beth Deemer |
| *Counsel for Consolidation Coal* | JONES DAY |
| *Company* | 500 Grant Street Suite 4500 |
| | Pittsburgh, PA  15219 |
| | (412) 391-3939 |
| | mhginsberg@jonesday.com |
| | mbdeemer@jonesday.com |
| | |
| | *Counsel for PCS Phosphate Company, Inc.* |

**ORAL ARGUMENT REQUESTED**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, appellants Consolidation Coal Company ("Consol") and PCS Phosphate Company, Inc. ("PCS") state:

1.     Is party/amicus a publicly held corporation or other publicly held entity?

No.

2.     Does party/amicus have any parent corporations?  If yes, identify all parent corporations, including grandparent and great-grandparent corporations.

Consol is wholly owned by CONSOL Energy, Inc., whose securities are publicly traded.

PCS is wholly owned by Potash Corporation of Saskatchewan Inc., whose securities are publicly traded.

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  If yes, identify all such owners.

See answers to #2.

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  If yes, identify entity and nature of interest.

No.

5.     Is party a trade association? (amici curiae do not complete this question)  If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member.

No.

6.     Does this case arise out of a bankruptcy proceeding?  If yes, identify any trustee and the members of any creditors' committee.

No.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................i

TABLE OF AUTHORITIES ......................................................................... iv

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUE......................................................................2

STATEMENT OF THE CASE.......................................................................2

    A.    Introduction. .........................................................................2

    B.    Proceedings and Disposition Below...............................................5

STATEMENT OF FACTS ...........................................................................7

    A.    Georgia Power and Its Transformers ...........................................7

    B.    Georgia Power's Scrap Sales to Ward .........................................13

    C.    Savannah Electric's Transformer Sales .......................................15

    D.    Ward's Repair and Sales Activities............................................16

    E.    Contamination at the Site from Ward's Activities............................18

    F.    The Cleanup, the Lawsuits, and the District Court's Decision..........20

SUMMARY OF ARGUMENT .....................................................................22

STANDARD OF REVIEW ........................................................................25

ARGUMENT .......................................................................................26

I.    SELLERS WHO, LIKE GEORGIA POWER, INTEND IN PART TO DISCARD HAZARDOUS SUBSTANCES ARRANGE FOR DISPOSAL UNDER § 9607(a)(3) ...............................................26

II.    GEORGIA POWER INTENDED IN PART TO DISPOSE OF PCBs WHEN IT SCRAPPED ITS OLD, BROKEN, OBSOLETE TRANSFORMERS ...................................................................35

    A.    Georgia Power and Ward Did Not Intend for Ward to Reuse the Residual Oil or the Transformers in Their Entirety ..........................35

    B.    The Residual Oil Within Georgia Power's Transformers Was Worthless, and the Transformers Themselves Had Little Value to Georgia Power.................................................................39

C.  The Residual Oil Within Georgia Power's Transformers and the Transformers Themselves Were Unusable at the Time of Georgia Power's Scrap Sales ............................................................. 43

D.  Georgia Power's Transformers Were in Poor Condition When Transferred to Ward ........................................................................ 47

E.  Georgia Power Knew or Did Not Care That Ward's Activities Would Result in the Disposal of PCB-Tainted Oil ........................... 50

F.  Georgia Power Indicated Its Intent to Dispose by Selling Its Scrap Transformers in Lots, As-Is, with No Warranty Except Title ....................................................................................................... 53

III.  SAVANNAH ELECTRIC INTENDED IN PART TO DISPOSE OF PCBs WHEN IT SOLD ITS OLD, OBSOLETE TRANSFORMERS ........ 55

IV.  THE PCB-LACED RESIDUAL OIL AND OIL-COATED PARTS INSIDE GEORGIA POWER'S TRANSFORMERS WERE "WASTES," FURTHER DEMONSTRATING GEORGIA POWER'S INTENT TO DISPOSE AND ITS STATUS AS AN ARRANGER ............................................................................................ 57

CONCLUSION ............................................................................................. 59

REQUEST FOR ORAL ARGUMENT ...................................................... 59

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Burlington Northern & Santa Fe Railway Co. v. United States*,
556 U.S. 599 (2009) ................................................................*passim*

*Cadillac Fairview/Cal., Inc. v. United States*,
41 F.3d 562 (9th Cir. 1994) (per curiam) ...................................36, 38

*Catellus Dev. Corp. v. United States*,
34 F.3d 748 (9th Cir. 1994) ........................................................43, 57

*Charbonnages de France v. Smith*,
597 F.2d 406 (4th Cir. 1979) ...........................................................26

*D.L. v. Baltimore City Bd. of Sch. Comm'rs*,
706 F.3d 256 (4th Cir. 2013) ...........................................................25

*FMC Corp. v. U.S. Dep't of Commerce*,
29 F.3d 833 (3d Cir. 1994) (en banc) ...............................................42

*Fla. Power & Light Co. v. Allis Chalmers Corp.*,
893 F.2d 1313 (11t Cir. 1990) .............................................45, 46, 47

*Gen. Analytics Corp. v. CNA Ins. Cos.*,
86 F.3d 51 (4th Cir. 1996) ...............................................................26

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*,
343 F.3d 669 (3d Cir. 2003) .............................................................53

*Nurad, Inc. v. William E. Hooper & Sons Co.*,
966 F.2d 837 (4th Cir. 1992) ..........................................26, 27, 57, 58

*Owen Elec. Steel Co. of S.C., Inc. v. Browner*,
37 F.3d 146 (4th Cir. 1994) .............................................................59

*PCS Nitrogen, Inc. v. Ashley II of Charleston LLC*,
714 F.3d 161 (4th Cir. 2013) ....................................................*passim*

*Pneumo Abex Corp. v. High Point, Thomasville & Denton Railroad Co.*,
142 F.3d 769 (4th Cir. 1998) ....................................................*passim*

iv

*Rosetta Stone Ltd. v. Google, Inc.*,
  676 F.3d 144 (4th Cir. 2012) ...................................................................39

*Schiavone v. Northeast Utilities Service Co.*,
  No. 3:08CV429(AWT), 2011 WL 1106228 (D. Conn. Mar. 22, 2011).............47

*United States v. Cello-Foil Products, Inc.*,
  100 F.3d 1227 (6th Cir. 1996) ...........................................................*passim*

*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) (per curiam)......................................................42

*United States v. Gen. Elec. Co.*,
  670 F.3d 377 (1st Cir. 2012)...............................................................*passim*

*United States v. Pepper's Steel & Alloys, Inc.*,
  658 F. Supp. 1160 (S.D. Fla. 1987) ...................................................46

*Waldburger v. CTS Corp.*,
  __ F.3d __, No. 12-1290, 2013 WL 3455775 (4th Cir. July 10, 2013).............27

*Westfarm Assocs. Ltd. P'Ship v. Wash. Suburban Sanitary Comm'n*,
  66 F.3d 669 (4th Cir. 1995) .........................................................27, 51

**STATUTES AND REGULATIONS**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

42 U.S.C. § 6903 ...............................................................29, 30, 57

42 U.S.C. § 9601 ...............................................................29, 30, 57

42 U.S.C. § 9607 ...........................................................................*passim*

42 U.S.C. § 9613 ...........................................................................1, 5

Comprehensive Environmental Response, Compensation, and Liability Act
  of 1980, 42 U.S.C. § 9601 *et seq.* ................................................*passim*

40 C.F.R. § 261.2 ...........................................................................58

40 C.F.R. § 761 (1983) ...................................................................54

40 C.F.R. § 761.20 (1983) ............................................................54

40 C.F.R. § 761.3 ...........................................................................9

40 C.F.R. § 761.60 (1983) ............................................................54

**OTHER AUTHORITIES**

68 Fed. Reg. 23,077 (Apr. 30, 2003) ..........................................20

Fed. R. App. P. 4(a) .........................................................................1

Fed. R. Civ. P. 54(b) ...................................................................1, 7

## JURISDICTIONAL STATEMENT

This case arises under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The district court had jurisdiction under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

On February 1, 2013, the district court granted summary judgment in favor of Georgia Power Company ("Georgia Power") against Consolidation Coal Company ("Consol"), Duke Energy Progress, Inc. f/k/a Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc. ("Progress"), and PCS Phosphate Company, Inc. ("PCS") on all their claims against it.  (Entry 1160.[1])  On May 1, 2013, the district court directed entry of final judgment as to those claims under Federal Rule of Civil Procedure 54(b).  (Entry 1200.)  On May 6, 2013, and May 15, 2013, Consol and PCS, respectively, appealed that judgment and all interlocutory orders that merged into it.  (Entries 1203, 1208; Entries 1207, 1212 in *Progress*.)  This Court's jurisdiction thus rests on 28 U.S.C. § 1291, and these consolidated appeals are timely, Fed. R. App. P. 4(a)(1)(A).

---

[1] As explained further below, there were two main consolidated actions, though identical versions of the materials relevant here were generally filed in each case.  This brief generally refers only to the docket entries from Consol's main case, No. 5:08-cv-00463-FL (E.D.N.C.), using the abbreviation "Entry X."  Where references to the docket entries in Progress's main case, No. 5:08-cv-00460-FL (E.D.N.C.), are necessary, those entries are referred to as "Entry X in *Progress*."

## STATEMENT OF THE ISSUE

Did the district court err in concluding that Georgia Power did not arrange for the disposal of the hazardous PCB-laced oil within its old, broken, obsolete transformers under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), when it scrapped those transformers to Ward?

## STATEMENT OF THE CASE

### A.     Introduction.

The Ward Transformer Company ("Ward") ran an electrical transformer repair and rebuilding business near Raleigh, North Carolina.[2]  Because of Ward's repair and rebuilding activities, its facilities and their surrounding area—known now as the Ward Transformer Superfund Site ("the Site")—became contaminated with polychlorinated biphenyls ("PCBs"), a hazardous substance found in some transformers' insulating oil.  To address the contamination, at EPA's request, Consol, Progress, and others entered into an Administrative Settlement Agreement and Order on Consent ("AOC") with the EPA in 2005.  PCS later voluntarily joined in the cleanup, though it is not a signatory to the AOC and has not settled

---

[2] Ward Transformer Company operated the business from 1965 to 1994, and Ward Transformer Sales & Service, Inc. operated it as a tenant on Ward Transformer Company's property from 1994 to 2005.  (Plaintiffs-SUMF ¶14 & n.2 (Entry 918); GPC-Response ¶14 (Entry 1023).)  This brief refers to both as "Ward."

with EPA, Consol, or Progress.  Consol and PCS have spent millions cleaning up so far and face additional costs in the future.

In several consolidated CERCLA suits, Consol and PCS sought to recover these costs from other responsible parties:  those who sold transformers to Ward (the "sale" defendants), those who paid Ward to repair transformers (the "repair" defendants), and those who consigned transformers to Ward (the "consignment" defendants).  Georgia Power, the only other party here, is a sale defendant because it sold Ward used, surplus, broken-down, and obsolete transformers containing PCBs.  Consol and PCS alleged that Georgia Power thus "arranged for disposal" of PCBs under 42 U.S.C. § 9607(a)(3), the CERCLA provision at issue.

Arranger liability turns on the seller's intent, and Georgia Power intended in part to dispose of the PCB-contaminated oil and broken or obsolete PCB-contaminated parts within its scrap transformers through its sales.  It treated its scrap transformers a lot like junk.  It usually (but not always) drained them of their free-flowing oil, rendering them inoperable and exposing their internal parts to damaging moisture.  It sold them in lots rather than individually, at scrap auctions where anyone could bid, and with no warranties except as to title.  And it sold them for prices reflecting largely the scrap value of their metal, not the value of a functioning transformer or the (worthless) PCB-tainted oil inside them.

3

What Ward did with the transformers and the materials inside them confirms that they were, indeed, a lot like junk. For non-functioning transformers, Ward had to conduct major repairs, including opening the transformer's tank and replacing damaged or defective coils, discarding oil-soaked parts in the process. For obsolete transformers, Ward had to open the transformer's tank and rewind the coils to create a marketable voltage configuration, again discarding the outdated, saturated parts.

Georgia Power knew its transformers were contaminated with PCBs. Some sold to Ward were filled with PCB-tainted oil. Others contained PCBs in the residual oil that remained after Georgia Power pumped them out. And, as Georgia Power knew from its own repair shop, when Ward performed the repairs needed to sell the transformers, those PCBs were discarded. These undisputed facts prove that, under the fact-intensive inquiry called for by *Pneumo Abex Corp. v. High Point, Thomasville & Denton Railroad Co.*, 142 F.3d 769 (4th Cir. 1998), and *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599 (2009), Georgia Power should pay its fair share of the resulting cleanup costs because it "arranged for disposal" of the PCBs inside its scrap transformers under CERCLA § 107(a)(3).

Georgia Power never intended for Ward to reuse the scrap transformers entirely. Rather, because no one could use the transformers as transformers in the

condition in which Georgia Power sold them, the expectation was that Ward would work on the transformers, replacing and discarding their old, PCB-tainted parts. Moreover, Georgia Power sold the broken, obsolete transformers in unusable conditions at scrap prices. And Georgia Power knew (as any reasonable person in its position would have) that, to market the transformers, Ward would have to repair them, discarding residual oil and oil-soaked parts in ways that could dispose PCBs in the process.

Despite this evidence, the district court concluded that no reasonable person could believe Georgia Power intended to dispose of PCBs, ignoring one *Pneumo Abex* factor and misapplying the others. On de novo review, this Court should reverse that conclusion and hold that Georgia Power intended to dispose of the PCBs contained within its scrap transformers, remanding for the district court to consider the other elements of arranger liability. At the very least, Consol and PCS have raised genuine issues of material fact about Georgia Power's intent, precluding summary judgment for Georgia Power.

### B.    Proceedings and Disposition Below.

In 2008 and 2009, Consol and Progress filed complaints against Georgia Power, PCS, and a number of other defendants seeking recovery of response costs and contribution toward those costs under CERCLA § 113(f), 42 U.S.C. § 9613(f). (*E.g.*, Entry 1; Entry 1 in *Progress*.) The district court consolidated these suits into

two cases, one with Consol as plaintiff and one with Progress as plaintiff. (Entry 131.) Both filed amended complaints in September 2009. (Entry 135, Entry 95 in *Progress*.) PCS then counterclaimed against Consol and Progress and crossclaimed against other defendants (including Georgia Power), seeking cost recovery under § 107(a). (Entry 218, Entry 326 in *Progress*.) Consol, Progress, and PCS alleged that Georgia Power's transactions with Ward—namely, its scrap sales of its old, damaged, PCB-laced transformers to Ward at auction—included an arrangement for disposal of PCBs under § 9607(a)(3). (Entry 135 ¶¶153(b), 154, 182; Entry 218 Crossclaims ¶¶3–4; Entry 95 in *Progress* ¶¶59, 62.)

The parties proceeded via a test case method under which a sale defendant and a repair defendant volunteered to litigate their respective liability, with discovery stayed for everyone else. (Entry 648 at 3–4, 7.)[3] Georgia Power is the sale test case defendant. After discovery regarding liability it moved for summary judgment. (Entries 880, 899.) Consol and PCS filed a joint cross-motion. (Entries 883, 919.) Progress filed its own. (Entries 938, 939.)

On February 1, 2013, the district court granted Georgia Power's motion and denied the cross-motions. (Entry 1160.) At Consol's and PCS's request (and with Georgia Power's consent), the district court entered final judgment on the claims

---

[3] The district court bifurcated the proceedings into liability and allocation phases. (Entry 310.) Only liability is at issue here.

6

against Georgia Power under Federal Rule of Civil Procedure 54(b) on May 1, 2013.  (Entry 1200.)  Consol and PCS timely appealed (Entries 1203, 1208; Entries 1207, 1212 in *Progress*), and this Court consolidated those appeals.

## STATEMENT OF FACTS

### A.    Georgia Power and Its Transformers.

Georgia Power supplies electricity to most of Georgia.  (Plaintiffs-SUMF ¶50; GPC-Response ¶50.[4])  It uses electrical transformers, devices that generally "step down" the voltage of electricity as it moves from power plants to end users. An oil-filled padmount transformer (the type at issue here) has several main parts: an enclosed, vacuum-sealed external tank that houses the transformer's components, an internal magnetic iron core, and coils consisting of copper or aluminum windings wrapped in cellulose insulation that tightly surround the iron core.  The core and coil must be completely immersed in the insulating oil to work properly.  When so immersed, the oil saturates the cellulose insulation and coats the surface of the core, the spaces between the core's iron layers, the transformer's

---

[4] This brief refers to Entry 918, Plaintiffs' Joint Statement of Material Facts Not in Dispute with Regard to Sale Test Case Defendant Georgia Power Company, as "Plaintiffs-SUMF."  It refers to Entry 1023, Defendant Georgia Power Company's Response to Plaintiffs' Joint Statement of Material Facts Not in Dispute with Regard to Sale Test Case Defendant Georgia Power Company, as "GPC-Response."  And it refers to Entry 1015, Plaintiffs' Joint Response to Georgia Power Company's Statement of Undisputed Material Facts—which contains a copy of Georgia Power's statements and the plaintiffs' responses to them—as "Plaintiffs-Response."

other internal components (such as gaskets), and the sides of the transformer tank. (Plaintiffs-SUMF ¶29; GPC-Response ¶29.)

Georgia Power's oil-filled transformers posed two key problems for the company.  First, Georgia Power frequently found itself with transformers "[it] no longer had a use for" (Dennis Dep. 70:3–9 (PA246)[5]), including transformers broken beyond the capabilities of its own Forest Park repair facility (Plaintiffs-SUMF ¶¶52–53; GPC-Response ¶¶52–53), old or redundant ones, and obsolete ones (Plaintiffs-SUMF ¶59; GPC-Response ¶59).  Second, many of those transformers contained PCBs in their insulating oil, as Georgia Power's own tests indicated.  (Plaintiffs-SUMF ¶¶62, 74; GPC-Response ¶¶62, 74.)  As the risks associated with PCB exposure became more apparent and the regulations governing their use more stringent, Georgia Power undertook "an effort to really try to eliminate PCBs in [its] systems."  (Dennis Dep. 130:3–10 (PA273).)

To address the first problem, Georgia Power developed internal policies and procedures to "dispos[e] of surplus, obsolete or damaged distribution line transformers" "to the best advantage of the company" (1974 Policy at 1, 3 (PA503, 505)), policies and procedures which it later revised to also address the second

---

[5] This brief refers to Entries 884–98, 900–04, 906–07, 909–14, and 916–17, the entries that contain the appendix filed in support of Consol's, Progress's, and PCS's motion for summary judgment as "PA."  Similarly, it refers to Entries 1017–20, the Plaintiffs' Supplemental Appendix, as "PSA."

problem.[6]  As relevant here, under those policies and procedures obsolete or

broken transformers were shipped from the field to Forest Park.  (Plaintiffs-SUMF

¶55; GPC-Response ¶55.)  Once there, they were tested for PCBs (Plaintiffs-

SUMF ¶56; GPC-Response ¶56), and placed within one of three categories:

(1) "PCB Transformers," containing 500 or more parts per million ("ppm") PCBs;

(2) "PCB-Contaminated Transformers," containing 50 to 499 ppm PCBs; and

(3) "Non-PCB Transformers," with less than 50 ppm PCBs.  40 C.F.R. § 761.3.

    Because of EPA regulations and company policy, that classification

determined what Georgia Power could do with a transformer.  For all practical

purposes, PCB- and PCB-Contaminated Transformers could not be sold for

continued use or rebuilding.  (Plaintiffs-SUMF ¶¶58(a)–(b), 67–68; GPC-Response

¶¶58, 67–68.)  Accordingly, regardless of age or condition, Georgia Power paid

vendors to take PCB Transformers and their oil away for destruction.  (Plaintiffs-

SUMF ¶¶58(a), 67; GPC-Response ¶¶58, 67; Plaintiffs-SUMF ¶122; GPC-

Response ¶122 (describing Georgia Power's disposal vendor costs).)  While

---

[6] Georgia Power initially developed its written disposal procedure in 1974.
(Plaintiffs-SUMF ¶55; GPC-Response ¶55.)  After the passage of the Toxic
Substances Control Act of 1976 and the promulgation of its implementing
regulations, Georgia Power expanded and refined its transformer disposal
procedures so as to comply with the different disposal standards applicable to
transformers with different levels of PCB contamination discussed below.
(Plaintiffs-SUMF ¶62; GPC-Response ¶62.)  That expanded procedure was in
place during the timeframe relevant here.

Georgia Power could fix and reuse PCB-Contaminated transformers (Plaintiffs-SUMF ¶¶58(b), 68; GPC-Response ¶¶58, 68), by the early 1980s it had stopped performing major repairs on them (Dennis Dep. 20:3–13 (PA222)) and could not sell unusable PCB-Contaminated transformer carcasses to repair shops (Plaintiffs-SUMF ¶68; GPC-Response ¶68). Instead, it would sell them to TSCA-licensed smelters. The drained oil was burned in licensed boilers or sent to a disposal vendor. (Plaintiffs-SUMF ¶68; GPC-Response ¶68.)

Georgia Power either repaired and reused Non-PCB Transformers itself or scrapped them through salvage sales. (Plaintiffs-SUMF ¶69; GPC-Response ¶69.) If it chose the latter path, Georgia Power usually (but not always) drained the oil by pumping out the transformer, leaving residual oil coating the internal surfaces and saturating the coils' insulation. (Plaintiffs-SUMF ¶70; GPC-Response ¶70.) Getting rid of all of the PCBs in a transformer is very difficult—even flushing with uncontaminated oil or solvent generally does not remove all of the PCBs trapped in a transformer's core and coil. (10/31/11 Walsh Report at 2 (PA1026).) Because PCBs are a part of the oil, PCBs remained in the drained transformers wherever residual oil was found.

Georgia Power kept the oil it pumped out for reuse if it contained 10 or less ppm PCBs and sold the rest as secondary fuel. (Plaintiffs-SUMF ¶70; GPC-Response ¶70.) Georgia Power described the oil that it sold as waste oil and

included a warning that the oil contained PCBs and could not be used for certain purposes, such as dust control.  (1982 Policy at 15–16 (PA573–74).)

Georgia Power routinely described its sale of obsolete, broken-down transformers as "scrapping" them.  (*E.g.*, 1974 Policy at 3 (PA505) (discussing Georgia Power's "Scrapping Procedure").)  And Georgia Power treated these transformers like scrap as well.  It usually left them drained and uncapped, rendering them inoperable and exposing their coils to atmospheric moisture.  (Plaintiffs-SUMF ¶¶79–82; GPC-Response ¶¶80–82; *see also* Dennis Dep. Ex. 208 at GPC-Ward-001187 (PA608) (noting that some of Georgia Power's scrap transformers stored for sale ended up with an "oil residue & rainwater mixture" inside them).)  Moisture to a transformer is "basically like cancer to a person"; it is "the number one cause of failures" because it lowers a transformer's insulation resistance, thereby preventing the transformer from properly doing its job.  (Reed Dep. 108:4–6 (PA385).)  As a sophisticated transformer operator, Georgia Power knew about the dangers of moisture, but it failed to reseal the transformers or take any other steps to prevent moisture from damaging them.  (Plaintiffs-SUMF ¶82; GPC-Response ¶82.)  As one of its employees said, moisture in a transformer was "not a concern if [Georgia Power was] not going [to] keep it."  (Brown Dep. 56:23–24 (PA169).)  In keeping with this general philosophy regarding its scrap transformers, Georgia Power had no quality control procedures applicable to them.

11

Once it decided to scrap transformers, Georgia Power's Salvage Department set up auctions for their sale. (Plaintiffs-SUMF ¶¶60–61; GPC-Response ¶¶60–61.) Georgia Power grouped the transformers into lots and required bidders to bid on the entire lot rather than on individual transformers. (Plaintiffs-SUMF ¶88; GPC-Response ¶88.) The bidders then stated the amount they would pay per kilovolt-ampere ("KVA," a measure of transformer capacity) for the group.[7] (Plaintiffs-SUMF ¶88; GPC-Response ¶88.)

Georgia Power sold each lot to the highest bidder with no minimum price. (Plaintiffs-SUMF ¶88; GPC-Response ¶88.) The winning bidder could inspect the transformers, but it took them with no warranty except as to title and no warnings about PCBs. (*E.g.*, Plaintiffs-SUMF ¶89; GPC-Response ¶89.) During the timeframe relevant here, Georgia Power let any legitimate business bid, and the bidders included both rebuilders like Ward and salvage operators who simply wanted to recover the copper or aluminum in the transformers' coils. (Plaintiffs-Response ¶¶26, 62.) By 1986, however, Georgia Power had "initiate[d] qualification procedures for those to whom [it] s[old] scrap transformers" as an attempt to "limit [its] liabilities in this area," including questionnaires and on-site audits. (10/15/86 Letter (PA642).) Ward did not complete its 1986 questionnaire,

---

[7] Notably, the bid prices were not based on the PCB-laden oil within the transformers.

but Georgia Power audited it that year and later dropped it from the list of approved purchasers.  (Plaintiffs-SUMF ¶124; GPC-Response ¶124.)

### B.    Georgia Power's Scrap Sales to Ward.

Between August 1983 and November 1984, Ward purchased 101 used transformers in lots at four different scrap auctions.  (Plaintiffs-Response ¶41.)  In August/September 1983, Ward purchased 43 transformers at per-lot prices ranging from $0.77 per KVA to $3.21 per KVA.  Georgia Power designated 21 of them as "scrap" at the time, indicating they needed repair, and Ward identified these same 21 as "FAULTY."[8]  Ten of the other transformers in the lot were sold full of oil.  Ward's later tests indicated that one of these transformers had 488 ppm PCBs upon arrival.[9]  (Plaintiffs-SUMF ¶¶92–103; GPC-Response ¶¶92–103.)  In March 1984, Ward acquired 20 drained transformers in two lots, paying $1.11 per KVA for one and $1.21 per KVA for the other.  Ward's records indicate that at least 10 were "FAULTY."  (Plaintiffs-SUMF ¶¶105–06; Plaintiffs-Response ¶64.)

---

[8] As Ward's employees later explained, a "faulty" transformer  was one whose coil windings were defective, often requiring "major work" to repair and make marketable.  (Ward Transformer Glossary of Terms at 1 (PA443)); Plaintiffs-SUMF ¶¶105–106.)

[9] Under Georgia Power's policies, this PCB-Contaminated Transformer should not have been scrapped.  While Georgia Power contended that Ward's PCB tests returned inaccurately high results (*e.g.*, GPC-Response ¶72), it has not claimed Ward's tests produced false positives (Plaintiffs-Response ¶57).

13

Similarly, in April 1984, Ward successfully bid on 18 transformers at per lot prices of $1.11 and $1.18 per KVA, though information regarding seven of these is scratched through on Ward's records. Ward's purchase order describes all of them as "FAULTY." While some of the transformers were drained, others still contained free-flowing oil. Upon arrival at Ward, one of these transformers tested at 12.8 ppm PCBs. (Plaintiffs-SUMF ¶¶107–09.) And in October 1984, Ward acquired 27 transformers in four lots at per KVA prices ranging from $1.74 to $2.16 per lot. The transformers were drained, though Ward's records indicate that one of them had "about 5 gals" of 17.4 ppm PCBs oil in it four years after arriving at Ward. (Plaintiffs-SUMF ¶¶110–11; GPC-Response ¶111; Plaintiffs-Response ¶82.)

At least 49 of the transformers Ward purchased were identified by Georgia Power and Ward as scrap or faulty. (Brewer Aff. Ex. A at B004924, GPC-Ward-000645; Brewer Aff. ¶¶9–11.) As the differences in per KVA prices listed above indicate, broken transformers were worth much less than working ones. (*E.g.*, Westover Dep. 172:17–173:4 (PA434–35).) Given the large amount of metal in the tank, core, and coil of transformers as large as these, even broken transformers were worth a considerable amount. (Plaintiffs-SUMF ¶121; GPC-Response ¶121.) As a result, "[s]crap market competition was always" present in used transformer markets like Georgia Power's. (Westover Dep. 174:3 (PA436).)

14

C.    Savannah Electric's Transformer Sales.

Georgia Power is also responsible for sales made by Savannah Electric and Power Company ("Savannah Electric"), which merged into Georgia Power in 2006.  (Plaintiffs-SUMF ¶125; GPC-Response ¶125.)  In the 1970s and 1980s, Savannah Electric considered itself part of the "vanguard in getting rid of PCBs" and wanted to "eliminate the liability" PCBs created.  (Tennille Dep. 15:5–6, 11–12 (PA395).)  Savannah Electric sold its surplus transformers to the highest bidder.  (Plaintiffs-SUMF ¶128; GPC-Response ¶128.)

In January 1980, Savannah Electric sold seven lots of surplus transformers (20 total, each oil-filled) to Electric Equipment Company of New York ("EECNY"), with whom Ward had a joint venture.  (Plaintiffs-SUMF ¶¶131–32; GPC-Response ¶¶131–32.)  Ward paid the freight costs for used transformers purchased by EECNY, stored them until one party found a purchaser, and did any needed repairs, with the parties then recouping their costs and splitting any excess.  (Plaintiffs-SUMF ¶131; GPC-Response ¶131.)  The 20 transformers arrived at Ward in early 1980 (Plaintiffs-SUMF ¶132; GPC-Response ¶132), with some containing PCBs (*e.g.*, Plaintiffs-SUMF ¶134 (noting a transformer that Ward tested at 17.9 ppm PCBs)).

15

### D.    Ward's Repair and Sales Activities.

Ward purchased these used, damaged, and obsolete transformers on speculation that it could keep them in its inventory until it could rebuild them to meet a later-discovered customer's specifications, leaving them outside on the ground in the interim.  (Plaintiffs-SUMF ¶¶23–25; GPC-Response ¶¶23–25.)  When it received an order for a rebuilt transformer, it would select a used transformer from its inventory, take it apart, and rebuild it to the customer's requirements, disposing of the oil and oil-coated defective or spent components (such as coils, insulating material, and gaskets) in the process.  (Plaintiffs-SUMF ¶¶24, 26–27; GPC-Response ¶¶24, 26–27.)  Ward also often cleaned the residual oil from the old components that it reused in rebuilding the transformers.  (Croson Dep. 100:15–101:16 (PA211–12).)

In keeping with its business model, Ward extensively repaired the transformers it purchased from Georgia Power to have a shot at recovering its investment.  Eighty of the 101 transformers it purchased were "rebuilt" when sold by Ward.  (Exhibit A to Plaintiffs-Response.)  Although Ward's terminology varied somewhat over the years, "rebuilt" generally indicated that Ward had to "untank the [core and coils] and do some work to the coils, whether [it was] reconnecting or rewinding part of it, but some internal work to the transformer in most cases."  (Brewer Dep. Vol. II 622:19–22 (PA137).)  Ward's records further

detail the repairs it performed on individual Georgia Power transformers. For example, transformer No. NFJ2032, purchased in the August/September 1983 salvage sale, was "faulty" on arrival. Ward took the transformer apart, rewound the primary coils, and placed the old coils into an incinerator to burn off the cellulose insulation so that it could scrap the underlying metal. (Plaintiffs-SUMF ¶91(a); GPC-Response ¶91.) And transformer No. H302037P72AA, purchased in April 1984, was similarly "faulty" and had an unusual voltage configuration that made it difficult to sell. Ward rewound the coils to a new configuration and again incinerated the old coils' insulation. (Plaintiffs-SUMF ¶91(d); GPC-Response ¶91.)

Though Savannah Electric's transformers appear to have been functional when EECNY purchased them, Ward still performed extensive work to sell many of them because of their obsolete voltage configurations. Three, for instance, were sold as "COMPLETELY REBUILT" and had their voltages changed, requiring Ward to open the transformers and rewind each transformer's secondary coil. (Plaintiffs-SUMF ¶135.) Another set of three transformers sold as "REBUILT AND GUARANTEED" had their coils baked out to remove moisture, two new bushings installed, gaskets replaced, and three pressure relief devices added, costing Ward 58 hours in labor and around $1,500 in parts. (Plaintiffs-SUMF ¶137.)

17

While Ward was able to sell each transformer it purchased from Georgia Power (and that EECNY purchased from Savannah Electric) in some fashion, (Plaintiffs-Response ¶¶85, 105), some sales were for parts, not for functioning transformers (A-007729 (PSA158) (indicating that a transformer was "Scrapped to China" in 2005)). Moreover, Ward invested significant resources into the transformers it repaired and sold (*e.g.*, A-029152 (PA1178) (132 hours of labor, 1,246 pounds of copper, and $886 in parts spent rebuilding a transformer)), and it sometimes even took a loss (E011575, E011583, WT017627 (PSA180–181, 202) ($2,346 loss on transformer serial number 80791)).

### E. Contamination at the Site from Ward's Activities.

In the district court's words, Ward's repair work "inevitably resulted in leaks and spills of PCB-contaminated oil" at Ward's facilities. (Entry 1160 at 8 n.14.) Ward had to drain any oil-filled transformer before it performed internal repairs. (Plaintiffs-SUMF ¶42; GPC-Response ¶42.) And as one of Ward's former employees testified, "[t]here's no way possible which you could work on a transformer without getting saturated in some cases with oil or you're going to have droppage here or there from something." (Aguirre Dep. Vol. II 139:11–15 (PA27).) As another put it, "[i]f you didn't get dirty [working at Ward], you weren't doing anything." (Rappleyea Dep. 16:24–25 (PA348).) Ward's employees generally worked with bare hands, and they released PCBs into Ward's

18

septic system when they later washed their hands.  (Plaintiffs-SUMF ¶¶39–40.)

Similarly, when Ward removed a transformer's core and coil from its tank to work

on the coils—as it often did for Georgia Power's transformers—residual oil from

the core and coil dripped, spilled, or leaked.  And when it burned old coils'

saturated insulation to recover the copper underneath, PCBs were again dripped,

spilled, or leaked.  (Plaintiffs-SUMF ¶¶42, 43.)  Even where Ward took

precautions, spills occurred; "there's going to be probably so much drippage [that]

the [drip] pan generally overflows . . . and then you have the oil running."

(Rappleyea Dep. 27:8–10 (PA359).)

        Georgia Power was in a position to know that Ward's activities could release

PCBs.  From its own repair shop it knew that double-pumped transformers retained

a sheen of oil, and its workers took precautions accordingly.  (Plaintiffs-SUMF

¶49; GPC-Response ¶49.)  It knew that, despite those precautions, spills occurred:

"We'd take measures.  We wouldn't want it to get on the floor, although you may

get some drops."  (Brown Dep. 17:16–17 (PA148).)  And it knew that most of the

transformers it sold to Ward needed major internal repairs.  Its own purported

expert witness testified that a transformer with a shorted-out coil was only a

"usable carcass" until repaired, and he explained that the low price Georgia Power

accepted for certain transformers it sold to Ward showed that "Georgia Power

obviously knew" they were "non-working." (Westover Dep. 135:13–22, 173:2–3

(PA433, 435).)

### F.    The Cleanup, the Lawsuits, and the District Court's Decision.

Ward's operations took a heavy toll on the Site. Most of the concrete floor

at Ward's main building had more than 50 ppm PCBs in it, and removal crews had

to dig down 29 feet in places to find soil with less than 1 ppm PCBs (EPA's

cleanup standard). (Collison Dep. Ex. 700 at 4, 7–8. (PA909, 912–13).) The Site

was added to the EPA's National Priorities List, 68 Fed. Reg. 23,077, 23,080

(Apr. 30, 2003), and in 2004 the EPA formally determined the need for a time-

critical removal action for it (Plaintiffs-SUMF ¶4; GPC-Response ¶4). The work

so far has been extensive and expensive: over 400,000 tons of soil have been

removed, and Consol and PCS have each paid more than $17 million to date.

(Plaintiffs-SUMF ¶¶7, 10; GPC-Response ¶¶7, 10.)

To recoup some of these and future costs, Consol and Progress, joined by

PCS as a cross-claimant, sued Georgia Power (and others) under CERCLA. They

argued that by selling its scrap transformers and the PCB-tainted residual oil and

PCB-laced defective components inside them to Ward, Georgia Power "arrange[d]

for disposal" of the useless PCBs under § 9607(a)(3).

The district court disagreed and granted summary judgment to Georgia Power. (Entry 1160.)[10]  Although it recognized that arranger liability turns on the parties' intent and that *Burlington Northern* and *Pneumo Abex* provide guidance for courts to use in assessing intent (Entry 1160 at 12–13), it failed to mention or apply the first *Pneumo Abex* factor—"the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused," 142 F.3d at 775.  Focusing on the transformers rather than the PCB-laden residual oil within them, the court then concluded that Georgia Power's transformers were valuable because Ward resold them for more than it paid, that they were useful because other courts have found used transformers to be useful, and that their drained, uncapped condition made no difference because they were not visibly leaking.  (Entry 1160 at 15–16.)  Finally, the court concluded that Georgia Power's knowledge of spills was irrelevant because Consol and PCS had alleged only knowledge stemming from Georgia Power's "general expertise," not specific knowledge "as to spills at Ward."  (Entry 1160 at 17.)

---

[10] Georgia Power contended that the affidavit of Richard Brewer (Entry 871), the Ward records supporting it, habit or routine evidence about release pathways, and the affidavit of Scott Canady (Entry 872) were inadmissible.  The district court assumed this evidence was admissible for purposes of its decision (Entry 1160 at 12), and this brief accordingly relies on it.

21

## SUMMARY OF ARGUMENT

I.      CERCLA is a comprehensive remedial scheme designed to promote the quick, effective cleanup of contaminated sites.  It encourages parties to sponsor cleanup efforts by allowing them to recoup their costs from other responsible parties, imposing strict liability on a broad range of parties throughout the chain of causation.  In light of CERCLA's broad remedial purpose, courts construe it liberally.

CERCLA's arranger liability provision ensures that owners of hazardous substances cannot contract away their responsibility to ensure the proper, safe disposal of such substances.  To do so, it holds those who arrange for the disposal of their hazardous substances through any means strictly liable for cleanup costs associated with any resulting pollution.  The Supreme Court recently confirmed that sellers of hazardous substances must intend to dispose of them to qualify as arrangers, *see Burlington Northern*, 556 U.S. at 611, but it did not disturb other, well-established aspects of arranger liability.  Under those principles, a seller is liable where it intended to dispose a hazardous substance even if it also intended to make money in the transaction.  And where a seller transfers used, damaged, or obsolete material, its knowledge that a disposal will occur because of the sale provides some proof that the seller intended in part to dispose of that substance.  Further, a seller's intent may be established through objective evidence.

22

II.    The Supreme Court has emphasized that courts considering arranger liability must conduct a fact-intensive, case-specific inquiry into the seller's intent. *See id.* at 610.  In conducting that inquiry, this Court looks first to four factors. *See Pneumo Abex*, 142 F.3d at 775.  Under those factors and others bearing on intent, the undisputed facts here demonstrate that Georgia Power intended in part to dispose of the PCBs found within its old, broken, obsolete transformers when it scrapped those transformers to Ward.  First, Georgia Power and Ward never intended for Ward to reuse the oil, the residual oil, or the transformers entirely. Rather, they expected that Ward would repair and recondition the transformers, necessarily disposing of their defective parts and PCB-tainted oil and residual oil in the process.  Second, the oil and residual oil stuck within Georgia Power's transformers was a liability—not a valuable product—and the transformers themselves were worth little more than the price of their metal given their poor condition.  Third, the oil trapped within the transformers had no use, and many of the transformers themselves were non-working or obsolete when Georgia Power scrapped them.  As a result, Ward had to repair or reconfigure them to have any chance of reselling them.  Fourth, Georgia Power treated its transformers like junk, leaving them uncapped and exposed to damaging moisture and selling them as scrap.  Moreover, Georgia Power knew that extensive repair activities like those needed by its scrap transformers would require discarding the PCB-tainted oil, and

23

the terms and conditions of its sales—in lots, as-is, with no warranty but title—reflected its desire to get rid of the transformers and the PCBs inside them.

In reaching a contrary conclusion, the district court misapplied *Pneumo Abex* and *Burlington Northern*. On the first factor, it failed to even mention the parties' intent with respect to reuse, even though this factor is the only one directly about the parties' intent and thus is most closely aligned with *Burlington Northern*. On the second, it failed to distinguish between the value of the PCBs in the residual oil and the value of the transformers, and its broad conclusion that the transformers had value simply because they were bought at auction and resold after repairs goes too far. On the third, it misread the applicable precedent in finding that old, broken transformers are "useful." On the fourth, it focused narrowly on whether the transformers were visibly leaking, even though Georgia Power's actions, in keeping with the transformers' condition, demonstrated the transformers' worthlessness in its eyes. In addition, the district court disregarded Georgia Power's knowledge of disposal because that knowledge came from Georgia Power's own practices, not observation of Ward's, a distinction without a difference.

III.    Under a similar fact-intensive analysis, Georgia Power is liable for Savannah Electric's sale of transformers to Ward's joint venturer EECNY. Although Savannah Electric's transformers technically functioned, they had little

24

value because of their outdated, utility-specific voltage configurations.  Savannah

Electric did not care that, to sell them, Ward had to open them up and rewind them

to new voltage configurations, discarding PCB-laced oil in the process.

IV.     As this Court has noted, CERCLA borrows RCRA's definition of

"disposal," which is defined by RCRA's definition of "waste."  Abandoned and

discarded materials such as the oil left within Georgia Power's transformers fit

comfortably within that definition, indicating that Georgia Power meant to dispose

of those wastes through its sales.

## STANDARD OF REVIEW

The district court's determination of an entity's status as a CERCLA liable

party is reviewed de novo.  *PCS Nitrogen, Inc. v. Ashley II of Charleston LLC*,

714 F.3d 161, 172 (4th Cir. 2013).  Summary judgment decisions are reviewed de

novo.  *D.L. v. Baltimore City Bd. of Sch. Comm'rs*, 706 F.3d 256, 258 (4th Cir.

2013).  "Summary judgment is appropriate only where there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law."  *Id.*  In

determining whether there is an issue for trial, the court must "view the facts, and

draw all reasonable inferences, in the light most favorable to the non-moving

party."  *Id.*

Whether a state of mind such as intent exists "can seldom be considered to

be beyond reasonable dispute because this [factual question] depends entirely upon

25

the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). And when that "circumstantial evidence" is ambiguous, "the question of intent cannot be resolved on summary judgment" and must be reserved for the finder of fact. *Gen. Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996).

## ARGUMENT

### I.   SELLERS WHO, LIKE GEORGIA POWER, INTEND IN PART TO DISCARD HAZARDOUS SUBSTANCES ARRANGE FOR DISPOSAL UNDER § 9607(a)(3).

"Congress enacted CERCLA in response to the increasing environmental and health problems associated with . . . hazardous wastes sites." *Ashley II*, 714 F.3d at 167 (internal quotation marks and citations omitted). To address these problems, CERCLA includes "a mechanism for cleanup of sites polluted with hazardous wastes" and "a mechanism by which a governmental entity or private party may recover the cost of clean up from all parties responsible for the pollution of the site." *Pneumo Abex*, 142 F.3d at 774 (citing 42 U.S.C. §§ 9607, 9613(f)); *see also Ashley II*, 714 F.3d at 167 (noting that CERCLA is designed "to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination" (quoting *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992))). This second mechanism works by imposing

26

strict liability on several "undeniably broad" categories of potentially responsible parties, *Ashley II*, 714 F.3d at 172, "reach[ing] back through the causal chain from those who ultimately dispose of a hazardous substance to those who transport and generate it," *Pneumo Abex*, 142 F.3d at 774.

This Court recently characterized CERCLA as "arguably the most remedial of all federal environmental statutes." *Waldburger v. CTS Corp.*, __ F.3d __, No. 12-1290, 2013 WL 3455775, at *7 (4th Cir. July 10, 2013) (internal quotation marks and citation omitted). It further noted that "CERCLA, as all remedial statutes, must be given a broad interpretation to effect its ameliorative goals." *Id.* (internal quotation marks and citation omitted); *see also Westfarm Assocs. Ltd. P'Ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995) (same). Thus, in applying CERCLA, the approach should not be one "that thwarts Congress's unmistakable goal of removing barriers to relief from toxic wreckage." *Waldburger*, 2013 WL 3455775, at *7. Rather, "[t]his circuit has been careful not to vitiate what was intended as remedial legislation by erecting barrier upon barrier on the road to reimbursement of response costs." *Nurad*, 966 F.2d at 846.

CERCLA's arranger liability provision places responsibility for cleanup costs on:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration

27

vessel owned or operated by another party or entity and containing
such hazardous substances.

42 U.S.C. § 9607(a)(3), (a)(4)(B).[11]  "[A]rranger liability was intended to deter

and, if necessary, to sanction parties seeking to evade liability by 'contracting

away' responsibility," "ensur[ing] that owners of hazardous substances may not

free themselves from liability by selling or otherwise transferring a hazardous

substance . . . for the purpose of disposal." *United States v. Gen. Elec. Co.*, 670

F.3d 377, 382 (1st Cir. 2012) (some internal quotation marks and citation omitted).

The Supreme Court recently confirmed the bounds of arranger liability in

*Burlington Northern*.  There, state and federal authorities sought to recover cleanup

costs from Shell Oil Company ("Shell"), who shipped new, valuable pesticides to

an agricultural chemical distributor even though it knew that some of the

hazardous pesticides leaked and spilled during delivery.  *See* 556 U.S. at 602–05.

The Court rejected the suit.  It first set out the poles of the arranger liability

spectrum, noting that liability "would attach . . . if an entity were to enter into a

transaction for the sole purpose of discarding a used and no longer useful

hazardous substance," but would not lie where it sold "a new and useful product if

---

[11] Under § 9607(a), plaintiffs in arranger cases must prove more than an
arrangement for disposal. *See Ashley II*, 714 F.3d at 167–68 (plaintiffs must prove
that the site is a "facility," that a "release" or threatened release occurred, and that
they have incurred response costs conforming to the National Contingency Plan).
The district court concluded that Georgia Power had not arranged for disposal
through its sales, so it did not address these elements.  (Entry 1160 at 12–20.)

the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* at 609–10. In between these extreme cases, courts must conduct a "fact-intensive inquiry" that "looks beyond the parties' characterization of the transaction . . . and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.*

Applying this fact-intensive inquiry, the Court exonerated Shell. Because "arrange" implies "action directed to a specific purpose," arranger liability exists only where someone "takes intentional steps to dispose of a hazardous substance" by one of the means listed in CERCLA's definition of "disposal." *Id.* at 611.[12] Shell did no such thing: it took steps to *prevent* the spills during delivery, and its knowledge of those spills was by itself insufficient to prove intent, particularly because those spills occurred "as a peripheral result of the legitimate sale of an unused, useful product." *Id.* at 612, 613.

---

[12] Borrowed from the Solid Waste Disposal Act ("SWDA"), *see* 42 U.S.C. § 9601(29), that definition reads: "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). As the district court acknowledged, Georgia Power need not have intended disposal *into* the environment, just disposition such that PCBs *may* enter the environment. (Entry 305 at 17–18.)

29

*Burlington Northern* thus recognized "the indispensable role that state of mind must play" in the arranger analysis.  *Id.* at 611 (quoting *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1233 (6th Cir. 1996)).  Fortunately, this Court has already laid out a set of factors that, when used as part of *Burlington Northern*'s overall inquiry, shed light on the seller's intent.  In *Pneumo Abex*, railroads shipped their used wheel bearings to a metal foundry in exchange for a set-off against the price of new bearings made from the old ones.  The metals within the old bearings were hazardous substances, and while those metals were safely contained in the old bearings at the time of sale, processing them (or virgin metals) into new bearings produced metal-contaminated dust and slag.  The foundry became polluted, and those who cleaned it up alleged that the railroads had "arrange[d] for . . . treatment" of a hazardous substance under § 9607(a)(3). 142 F.3d at 772–73.

This Court disagreed.  It noted that CERCLA borrowed its definition of "treatment" from the SWDA and that the borrowed definition[13] presupposed that

---

[13] The SWDA defines "treatment" as "any method, technique or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume."  42 U.S.C. § 6903(34); *see* 42 U.S.C. § 9601(29) (incorporating the definition into CERCLA).  The SWDA was amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"), and the two names are often used interchangeably.

30

the materials in question were discarded waste. *See id.* at 774. Accordingly, the court framed the question as "whether [the] transaction was for the discard of hazardous substances or for the sale of valuable materials," *id.* at 775, a detailed inquiry into the purpose and nature of the transaction just like the one *Burlington Northern* later prescribed, *see* 556 U.S. at 610 (describing the bounds of arranger liability in similar terms); *id.* (citing *Pneumo Abex* approvingly on another issue).

To answer that question, *Pneumo Abex* laid out four factors:

> [1] the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, [2] the value of the materials sold, [3] the usefulness of the materials in the condition in which they were sold, and [4] the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).

142 F.3d at 775. Applying these factors, this Court concluded that the railroads were not liable. The railroads and the foundry intended that the used bearings would be reused entirely, not reclaimed and reused, and the foundry used the bearings as a valuable raw material in creating new bearings. *See id.* Though they arrived dirty and covered in grease, that dirt and grease did not contain any hazardous substances, and no hazardous substances were released when the dirt and grease were removed. And though the bearings were broken upon arrival, their condition had no effect on the resulting pollution because producing bearings from virgin metal would have generated the same polluting dust and slag. *See id.*

31

Just as *Burlington Northern* left *Pneumo Abex*'s factors in place, it also left untouched several well-recognized aspects of the arranger liability doctrine. First, sellers are on the hook even if they did not mean to dispose the entire item. Rather, to be liable, they need only intend that "at least a portion of the product be" discarded through the sale. *Burlington Northern*, 556 U.S. at 612. Indeed, *Pneumo Abex*'s first factor recognized as much by asking courts to consider whether the parties meant to reuse the materials "entirely" or rather "reclaim[] and then reuse" them, discarding part in the process. 142 F.3d at 775.

Second, sellers may still be liable where their "*motives* for the 'sale' of a hazardous substance [were] less than clear," 556 U.S. at 610 (emphasis added)— that is, where they had other motives, such as making money, in addition to intending to dispose. In *Cello-Foil*—the case *Burlington Northern* quoted when laying out its intent standard, *see* 556 U.S. at 611—the court reversed a grant of summary judgment because, even though the "primary purpose" of the defendants' chemical drum return agreement was to "regain the[ir] deposit," there was evidence that the defendants' "further purpose was to dispose of the residual wastes returned with the drums." 100 F.3d at 1233.

Third, *Burlington Northern* recognized that "an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes . . . ." 556 U.S. at

32

612.  Where the seller knows disposal of a hazardous substance is a necessary result of the sale of a used, broken item, the seller may well be using the sale to arrange in part for disposal, making some money in the process.  *See, e.g.*, *General Electric*, 670 F.3d at 391 (imposing liability on the seller of scrap PCBs in part because it knew that disposal would occur).

Fourth, *Burlington Northern* did not alter the kind of proof CERCLA requires.  Sellers are liable so long as they have a "discernible element of intent to dispose," even if that intent is "not obvious."  *Id.* at 383–84.  And "CERCLA liability may be inferred from the totality of the circumstances and need not be proven by direct evidence."  *Ashley II*, 714 F.3d at 177 (internal quotation marks and citation omitted, alteration in original).  Indeed, "[f]requently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the [actor's] subjective state of mind . . . .  For normally the actor is presumed to have intended the natural consequences of his deeds."  *Cello-Foil*, 100 F.3d at 1233 (quoting *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring)).

In addition to these well-established features of arranger liability, when applying *Burlington Northern* and *Pneumo Abex* here it is important to bear in mind a critical distinction between those cases and this one.  In both *Burlington Northern* and *Pneumo Abex*, the parties' transactions centered around the

33

hazardous substance itself because the hazardous substance was the one that really mattered:  Shell's buyer purchased new pesticide to distribute to its own customers, *see* 556 U.S. at 602–04, and the foundry in *Pneumo Abex* purchased old bearings because their (hazardous) metal worked just as well as virgin metal in making new bearings, *see* 142 F.3d at 775.  In each case, the point of the sale was to transfer the hazardous substance to the buyer for the buyer's own use or resale, making it intuitively unlikely that the seller intended to dispose of it through the sale.

This case is different.  As explained in greater detail below, Ward had no interest in, and Georgia Power could not profit from independently selling, the hazardous substance at issue here:  the PCB-laced oil inside Georgia Power's transformers, coating their defective, obsolete parts.  That oil was not reclaimed, had no value, and could not be reused.  Instead, Ward wanted and Georgia Power sold vessels—the transformer tanks, cores, and coils—that happened to contain those hazardous materials, vessels that could be transformed into working, marketable items by replacing and discarding the worthless hazardous materials within them.  Because the hazardous materials were an unwanted accompaniment to the transactions rather than the purpose of them, Georgia Power meant to get rid of those materials when selling their containers to Ward.  And because arranger liability turns on the seller's intent with respect to the hazardous substance at issue, this Court should consider those hazardous materials, not just the transformer tanks

34

and cores that contained them, when applying *Pneumo Abex* and *Burlington*

*Northern* to the facts of this case.

## II. GEORGIA POWER INTENDED IN PART TO DISPOSE OF PCBs WHEN IT SCRAPPED ITS OLD, BROKEN, OBSOLETE TRANSFORMERS.

The undisputed facts here lead to one conclusion: Georgia Power intended

in part to dispose of PCBs when it scrapped its transformers to Ward. This Court

should reverse the district court's judgment that Georgia Power did not arrange for

disposal of a hazardous substance and remand for consideration of the other

elements of arranger liability. At the very least, Consol and PCS have identified

genuine issues of fact about Georgia Power's intent.

### A. Georgia Power and Ward Did Not Intend for Ward to Reuse the Residual Oil or the Transformers in Their Entirety.

*Pneumo Abex*'s first factor—"the intent of the parties to the contract as to

whether the materials were to be reused entirely or reclaimed and then reused,"

142 F.3d at 775—directly addresses the seller's motive. If the parties expected that

the buyer would reclaim the materials (for example, by processing them to remove

and discard hazardous substances) in order to reuse them, rather than reuse them

entirely, *Pneumo Abex* says that the seller likely intended for the buyer to dispose

those hazardous substances: by design, the transaction included their discard, even

though the buyer was also able to salvage the rest. *Compare Pneumo Abex*, 142

F.3d at 775 (no liability because the seller intended for the buyer to reuse the old,

35

hazardous bearings entirely), *with Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562 (9th Cir. 1994) (per curiam) (liability where the buyer was meant to process the substance for sale and reuse). Applied here, to be "reused entirely" the Georgia Power transformers would have to have been sold by Ward for continued use with no treatment, repair, or reconstruction. In fact, however, Ward "reclaimed and then reused" the transformers by discarding their PCB-tainted oil and oil-coated damaged or obsolete parts.

Georgia Power never meant for Ward to reuse the PCB-tainted residual oil and damaged parts, but rather expected Ward to discard that oil when repairing the scrap transformers. As explained above, objective evidence of what actually happened is often more probative of a party's intent than its later subjective statements. *See, e.g.*, *Cello-Foil*, 100 F.3d at 1233. That objective evidence here demonstrates that Georgia Power expected that Ward would reclaim the transformers and dispose of the residual oil coating their defective parts. If Georgia Power had meant for Ward to reuse the transformers entirely, it would have offered normal warranties such as merchantability; instead, its purchasers took them "with no warranty except as to title." (Plaintiffs-SUMF ¶89; GPC-Response ¶89.) If Georgia Power had meant for purchasers to reuse each transformer entirely, it would have allowed them to bid on individual transformers; instead, it grouped them into lots and forced bidders to make an offer for the entire

36

lot.  (Plaintiffs-SUMF ¶88.)  And if Georgia Power had meant for purchasers to reuse them entirely, it would not have drained most of them of their free-flowing oil.  (Plaintiffs-SUMF ¶¶79–82; GPC-Response ¶¶80–82.)

Other objective evidence demonstrates that Georgia Power meant for Ward to reclaim the transformers rather than to reuse them entirely.  Georgia Power knew that the transformers contained PCB-tainted residual oil, even when drained.  (Plaintiffs-SUMF ¶70; GPC-Response ¶70.)  Georgia Power knew its transformers were broken, obsolete, and inoperable.  (*E.g.*, Westover Dep. 172:6–173:4 (PA434–35); Plaintiffs-Response ¶86.)  And regardless of whether transformer rebuilders or scrap dealers purchased the transformers, Georgia Power knew or should have known that they would be opened and their worn-out, PCB-tainted parts removed.  (Westover Dep. 135:16–22 (PA433) (transformers with shorted out coils are only "usable carcass[es]" until repaired); Plaintiffs-SUMF ¶53; GPC-Response ¶53 (acknowledging that Georgia Power had extensive knowledge about transformer repairs).)  Selling to either type of purchaser at auction was thus a convenient, cost-effective way for Georgia Power to get rid of unwanted transformers and their PCB-laced oil and parts.  (Plaintiffs-SUMF ¶122; GPC-Response ¶122 (describing disposal costs).)

*Pneumo Abex* put this factor first, and it is the only one that looks directly at the parties' intent.  But the district court did not mention this factor or explain why

it does not apply here.  Instead, the court focused on the fact that by using new replacement parts, Ward was able to rebuild and resell most of the transformers, ignoring the fact that the old, damaged parts and residual oil inside them were discarded.  (Entry 1160 at 13, 15–17.)

This approach was mistaken.  As explained above, arranger liability exists where the seller intends that "*at least a portion* of the product be disposed of" through the transaction.  556 U.S. at 612 (emphasis added); *see also Pneumo Abex*, 142 F.3d at 775 (asking courts to consider whether the parties meant to reuse the materials "entirely" or discard some when reclaiming for reuse).  Indeed, *Pneumo Abex* cited with approval *Cadillac Fairview*, where (in this Court's words) the seller of a contaminated chemical was held liable "because [the] party's intent in [the] transaction was for [the] buyer to process [the chemical] and remove hazardous materials from it so that [the chemical] could be reused."  *Pneumo Abex*, 142 F.3d at 775.  Like the defendant in *Cadillac Fairview*, Georgia Power benefited from its transformer sales, in part because they were a convenient, no-cost way to get rid of the their damaged, obsolete, PCB-tainted components and remaining PCB-laden oil within the transformers.  Georgia Power may have sold the transformers, but it discarded the hazardous materials inside them.

Properly considered, the first *Pneumo Abex* factor demonstrates that Georgia Power intended in part to dispose of the PCB-laden oil stuck within its scrap

transformers.  The district court's failure to apply the first factor is a fatal error requiring that the judgment be vacated.  *See, e.g.*, *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 170 (4th Cir. 2012) (remanding for the district court to apply the proper test).  Moreover, properly applied, that factor requires a finding that Georgia Power arranged for disposal of a hazardous substance.

### B.    The Residual Oil Within Georgia Power's Transformers Was Worthless, and the Transformers Themselves Had Little Value to Georgia Power.

*Pneumo Abex*'s second factor relates to the value of the materials sold.  *See* 142 F.3d at 775.  Where the buyer paid handsomely for the materials, the parties likely did not mean for the buyer to throw them away.  But where the seller cared about getting rid of the materials as well as making a profit, or where the hazardous materials were themselves worthless and merely attached to a valuable object, the seller likely intended in part to dispose.  *See General Electric*, 670 F.3d at 385; *Cello-Foil*, 100 F.3d at 1232 n.1, 1233–34.

This factor also cuts against Georgia Power.  The PCB-tainted residual oil within Georgia Power's transformers was worthless.  Georgia Power recovered Non-PCB oil where it could, reusing some and disposing of the rest as waste oil through sales.  (Plaintiffs-SUMF ¶70; GPC-Response ¶70.)  But residual oil cannot easily be removed.  (10/31/11 Walsh Report at 2 (PA1026).)  As a result, it could not be recouped and reused or sold as waste, either by Georgia Power or by Ward.

39

Similarly, since no one wanted the broken, obsolete, oil-covered parts within Georgia Power's transformers, they too could not be profitably removed. Rather than removing these hazardous materials, Georgia Power left them in place, knowing that Ward would have to get rid of them when repairing the transformers. They were the worthless accoutrements to salvageable transformers, impossible to extract but necessary to expel.

Rather than consider the value of the residual oil or the oil-soaked parts, the district court focused on the worth of used transformer carcasses as a whole. (Entry 1160 at 15.) But this approach ignores the difference between whatever value the transformers had and the worthlessness of the oil within them. As indicated above, in both *Burlington Northern* and *Pneumo Abex*, the hazardous substance was also the valuable one, making it unlikely that the buyer planned on disposing part of it. *Cf. Pneumo Abex*, 142 F.3d at 775 (noting that the foundry set off the price it paid for the old bearings by the amount of non-hazardous but useless dirt it had to remove from them). Here, by contrast, whatever value the transformers had existed *despite* the tainted residual oil, not because of it. On these facts, it is quite plausible to conclude Georgia Power wanted to get rid of worthless PCBs in the residual oil and damaged parts and could conveniently do so because the oil happened to be found inside transformers with some remaining salvage value to rebuilders and scrappers.

40

Even on its own terms, however, the district court's decision is mistaken. For example, it ignored evidence that any payment Georgia Power received from the sales was incidental to its desire to be rid of junk transformers. Georgia Power "no longer had a use for" those transformers (Dennis Dep. 70:3–9 (PA246)); as its own policy stated, it just wanted to remove them from its asset base and "dispos[e] of" them "to the best advantage of the company" (1974 Policy at 1, 3 (PA503, 505)). After all, Georgia Power sold and distributed electricity—it was not in the business of selling obsolete and junk transformers. (Plaintiffs-SUMF ¶51; GPC-Response ¶51.)

Moreover, the district court overstated the value of the transformers. What Ward paid for them speaks volumes about their value *as transformers*. In many instances, their purchase price represented little more than the salvage value of the core, coils, and tank, which contained thousands of pounds of recyclable metals. (Plaintiffs-SUMF ¶121; GPC-Response ¶121; Westover Dep. 174:1–3 (PA436) ("[s]crap market competition was always" part of used transformer markets).) The faulty and obsolete transformers in particular were sold at prices that reflected the value of those metals, not the value of a functioning transformer (Westover Dep. 172:17–173:4 (PA434–35)), as the presence of scrap bidders at Georgia Power's auctions indicates (Plaintiffs-Response ¶62).

41

Nonetheless, the district court concluded that Georgia Power's transformers were valuable because Ward bought them at auction and resold most "after reconditioning and/or reconfiguration, making thousands of dollars more than what" it paid. (Entry 1160 at 15.) Of course, at summary judgment the district court must make all reasonable inferences in favor of the non-moving party. *See, e.g.*, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). Despite this rule, the district court ignored the considerable resources Ward spent shipping, repairing, rebuilding, and reconditioning the transformers, not to mention Ward's overhead costs, in concluding that the transformers had significant value in light of Ward's resale price. (*E.g.*, E011575, E011583, WT017627 (PSA180–181, 202) (illustrating that Ward took a loss on one transformer).)

The district court also ignored the costs Ward and Georgia Power threw onto others. The dirtier the shop, the easier it is to make money. If arrangers can escape liability by choosing "profitable" purchasers for their unwanted hazardous items, they will pass the costs of proper disposal and cleanup from themselves to fly-by-night operators to the taxpayer. CERCLA, however, should "serve[] as an incentive for the sound treatment and handling of hazardous substances," not the opposite. *FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 840 (3d Cir. 1994) (en banc) (internal quotation marks and citation omitted, alteration in original).

42

The district court's focus on Ward's resale price also sweeps too broadly. Sellers have long been liable even where their buyers find value in their purchases. *See, e.g.*, *General Electric*, 670 F.3d at 380, 391 (chemical company liable for chemicals sold to paint manufacturer); *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 751–52 (9th Cir. 1994) (auto parts store arranged for disposal by selling spent batteries to a recycler). And rightly so: sellers should not get a free pass to dispose of their unwanted hazardous substances just because those substances (or, worse, the items to which they are attached) retain some value to others. Indeed, whether Ward made money off of its purchases is ultimately irrelevant to Georgia Power's liability: CERCLA holds *every* seller who "arranged for disposal" of hazardous substances responsible, 42 U.S.C. § 9607(a)(3), not just those whose purchasers cannot turn a profit while disposing of hazardous items.

### C. The Residual Oil Within Georgia Power's Transformers and the Transformers Themselves Were Unusable at the Time of Georgia Power's Scrap Sales.

The third *Pneumo Abex* factor focuses on the usefulness of the materials sold. *See* 142 F.3d at 775. People do not intend to dispose of hazardous substances when selling new, useful products, at least where they have no knowledge of their buyers' plans to dispose. *See Burlington Northern*, 556 U.S. at 610. But old, broken objects—particularly ones outside of the seller's primary business—are different. Because such items often have no use to the seller or

become useful only with repairs, it is more likely the seller meant to dispose of them and found someone willing to pay.

Unlike the new pesticides in *Burlington Northern*, the PCB-laden residual oil inside Georgia Power's transformers had little use:  it could not profitably be extracted and resold (Plaintiffs-SUMF ¶70; GPC-Response ¶70; 10/31/11 Walsh Report at 2 (PA1026)), it could not by itself cool a transformer during operation (Plaintiffs-SUMF ¶29; GPC-Response ¶29), and its PCB contamination made it undesirable to use in rebuilt transformers.

Moreover, the transformers themselves were often inoperable.  Those that were drained did not work in their unfilled condition, and many were uncapped, exposing their internal components to damaging moisture in advance of the scrap sales.  (Plaintiffs-SUMF ¶¶79–80; GPC-Response ¶¶80.)  In order to be used, many required substantial repairs.  (Plaintiffs-Response ¶86.)  Those marked "faulty," for example, had defective coils that typically required "major work." (Ward Transformer Glossary of Terms at 1 (PA443); Plaintiffs-SUMF ¶¶105–06.) And those with unusual or obsolete voltage settings had to be rebuilt and rewound to a marketable configuration.  (Plaintiffs-SUMF ¶91(c); GPC-Response ¶91.)

The district court never examined whether the PCB-tainted residual oil itself had any use, nor did it ask about the usefulness of the PCB-laced discarded parts. And while the court acknowledged that Georgia Power's transformers had to be

"remanufactured, which included removing defective parts" before they would work (Entry 1160 at 16), it nonetheless concluded that they were "useful" at the time of sale for *Pneumo Abex* purposes.  (*Id*.)  To reach this surprising conclusion, it relied on cases supposedly holding that used transformers are useful materials and on *Pneumo Abex* itself, which (in its view) held that broken bearings were useful simply because they could be melted down and remade.  (*Id.* at 15–16 (citing, *e.g.*, *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir. 1990).)  In its view, because Georgia Power's transformers "were not even used for scrap metal, but all or most continued to be used as transformers after their sale because they had not reached the end of their useful lives," those transformers must have been useful under *Pneumo Abex*.  (Entry 1160 at 16.)

The district court was wrong on the facts.  While Ward reused some transformer components (such as cores and tanks), it routinely removed the oil-covered metal coils, burned off their oil-soaked insulation, and scrapped the metal.  (Plaintiffs-SUMF ¶27.)  And as explained above, many of the transformers had no remaining "useful life" unless and until Ward performed substantial repairs, repairs that exposed PCB-laced oil to the environment.  (*E.g.*, Plaintiffs-SUMF ¶¶112–18.)  Rather than view these facts in the light most favorable to Consol and PCS, the court overlooked them and drew inferences in Georgia Power's favor.

45

The district court was also wrong on the law. *Pneumo Abex* held that the bearings, which were comprised of the hazardous metals at issue, could be used as a raw material without any processing to remove hazardous substances. It emphasized that the bearings' dirty, grease-covered condition had nothing to do with the pollution at the site: "slag and dust would be produced even if virgin materials were used to make the new bearings," and "[t]he removal of the dirt and grease was incidental to remolding new bearings, just as it would have been incidental to the molding of new bearings from virgin materials." 142 F.3d at 775. Moreover, removing that dirt and grease did not involve the discard of any hazardous substances. Here, by contrast, the broken transformer parts could not be reused at all. And to reuse the transformer carcasses, Ward had to process them to remove and discard the PCB-tainted oil and defective parts. (*E.g.*, Plaintiffs-SUMF ¶¶26–27, 91; GPC-Response ¶91.)

*Florida Power & Light* does not help the district court either. Florida Power scrapped transformers to a metal salvager at the end of their useful lives. *See* 893 F.2d at 1314–15. After the salvager's property became contaminated, Florida Power (facing arranger liability like Georgia Power) agreed to help with cleanup efforts (unlike Georgia Power). *See United States v. Pepper's Steel & Alloys, Inc.*, 658 F. Supp. 1160 (S.D. Fla. 1987). It then sought to hold the transformers' *original manufacturers* liable for their sales of the then-new transformers to

46

Florida Power forty years earlier. *See Florida Power & Light*, 893 F.2d at 1314–15. All *Florida Power & Light* said, then, is that new, unused transformers are useful products; it said nothing about whether broken, inoperable transformers are. *See Burlington Northern*, 556 U.S. at 610 (citing *Florida Power & Light* as a "new and useful product" case).[14] Thus, contrary to the district court's unsupported conclusion, the transformers' broken, obsolete condition demonstrates that Georgia Power intended in part to dispose of the residual PCBs within them.

## D. Georgia Power's Transformers Were in Poor Condition When Transferred to Ward.

*Pneumo Abex* instructed courts to consider "the state of the product at the time of transferral," asking parenthetically "was the hazardous material contained or leaking/loose." 142 F.3d at 775. This factor, too, cuts Consol's and PCS's way. Given their dilapidated state, Georgia Power's sale of contained but non-working transformers was no different than selling leaking ones: Georgia Power knew that many of the transformers had to be repaired, and it knew many repairs would require opening the transformers and dealing with defective parts and residual oil.

---

[14] The district court also relied on *Schiavone v. Northeast Utilities Service Co.*, No. 3:08CV429(AWT), 2011 WL 1106228 (D. Conn. Mar. 22, 2011), an unpublished, out-of-Circuit district court decision that deserves no weight. *Schiavone*'s two-paragraph analysis said nothing of the transformers' usefulness, focusing instead on the parties' failure to mention PCBs in their contract. *See* 2011 WL 1106228 at *6. CERCLA, however, "does not require a smoking gun," *Ashley II*, 714 F.3d at 177, and *Burlington Northern* called on courts to look beyond the parties' labels into the real-world facts of the transaction, *see* 556 U.S. at 610.

47

Had it removed those materials before sale, it would have eliminated the risk to the environment resulting from Ward's practices without reducing the sale price of the transformers. After all, Ward valued the transformer carcasses, not their broken, defective, oil-soaked parts.

The district court accepted that many of Georgia Power's transformers were drained, exposed to the atmosphere, and damaged. (Entry 1160 at 16.) But it held that these facts "do not amount to leaking at the time of sale . . . ." (*Id.*) Apparently it came to this conclusion because the transformers were not visibly spilling oil.

The district court failed to recognize the significant factual differences between this case and *Pneumo Abex*. In both cases, the hazardous material was not visibly leaking at the time of sale, and in both cases that hazardous material was ultimately released into the environment. But in *Pneumo Abex*, the contained hazardous materials were released only when they were put to use as raw materials, because only then was metal-bearing dust and slag produced. *See* 142 F.3d at 775. Here, by contrast, the hazardous materials in Georgia Power's transformers were not put to use as raw materials; instead, they were removed and discarded by various means, often because of the poor state of the transformers at the time of sale. Where, as here, the ultimate leakage occurs because of the product's poor condition rather than because of the hazardous substance's use as a

48

valuable raw material, it is more likely the seller intended to discard the hazardous substance rather than transfer a useful product.

The district court also read *Pneumo Abex* too narrowly. Even if *Pneumo Abex* itself focused primarily on whether the hazardous materials were leaking or loose at the time of the sale, courts evaluating the fourth factor should also look at the item's general condition and the seller's treatment of it—just as selling a visibly leaking product sheds light on the seller's intent, so does selling one that is damaged and faulty and has been dealt with as such. *See General Electric*, 670 F.3d at 385–86 (noting how General Electric labeled the chemical "scrap oil" and allowed it to become contaminated). That is especially so where making the product fit for sale "inevitably result[s] in leaks and spills." (Entry 1160 at 8 n.14).)

Viewed in that light, Georgia Power intended in part to dispose of PCBs. Georgia Power's transformers were a lot like trash. By definition, they were ones that it "no longer had a use for" because of their age, obsolescence, or condition. (Dennis Dep. 70:3–9 (PA246); Plaintiffs-SUMF ¶69; GPC-Response ¶69.) And Georgia Power treated them accordingly. It called its sales "scrap" sales and its procedures "scrapping" procedures. (1974 Policy at 3 (PA505) (discussing Georgia Power's "Scrapping Procedure").) It generally drained them and thereby exposed their coils to the "cancer" of atmospheric moisture, "the number one cause

49

of failures" in transformers.  (Plaintiffs-SUMF ¶¶79–80; GPC-Response ¶¶79–80;
Reed Dep. 108:4–6 (PA385).)  Indeed, some even became contaminated with an
"oil residue & rainwater mixture."  (Dennis Dep. Ex. 208 at GPC-Ward-001187
(PA608).)  Although Georgia Power knew about these problems, it did nothing in
response.  (Plaintiffs-SUMF ¶81; GPC-Response ¶81.)  Moisture was "not a
concern" for it because it no longer wanted the transformers.  (Brown Dep. 56:23–
24 (PA169).)  People do not spend money to keep junk in good shape when they
simply plan on scrapping it.

### E.    Georgia Power Knew or Did Not Care That Ward's Activities Would Result in the Disposal of PCB-Tainted Oil.

*Pneumo Abex* did not purport to provide an exhaustive list of factors to use
in the arranger inquiry; instead, it recognized that other courts had "focus[ed]" on
those factors and then used them as a guide for its own detailed, fact-intensive
inquiry into the parties' arrangement.  142 F.3d at 775.  And *Burlington Northern*
did not require any particular methodology in assessing intent.  Rather, quoting
*Pneumo Abex*, it instructed courts to make a "fact-specific inquiry into the nature
of the transaction."  *Burlington Northern*, 556 U.S. at 610 (quoting 142 F.3d at
775).  Thus, although the *Pneumo Abex* factors provide a helpful analytical starting
point, courts must consider any fact that bears on intent.  *See Burlington Northern*,
556 U.S. at 613 (noting that Shell took steps to prevent spills).

50

Knowledge is one of those facts. "[A]n entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes." *Burlington Northern*, 556 U.S. at 612. Although the seller's knowledge provides little insight where disposal occurs on the periphery of the sale of "an unused, useful product," *id.*, it says more where, as here, the seller gets rid of an old, broken product, *see General Electric*, 670 F.3d at 387–88 (analyzing in depth GE's knowledge of the scrap buyer's activities). Moreover, as this Court has pointed out in related contexts, "CERCLA does not sanction willful or negligent blindness." *Westfarm*, 66 F.3d at 682 (internal quotation marks and citation omitted).

Georgia Power knew or willfully ignored the fact that PCB-laced oil would be discarded through its sales. It knew that its filled transformers had to be drained prior to internal repairs. (Plaintiffs-SUMF ¶49; GPC-Response ¶49.) It knew that drained transformers retained a sheen of residual oil. (Plaintiffs-SUMF ¶33–34; GPC-Response ¶33–34.) Its own repair employees would "get some of that sheen on [their] gloves or [their] hands" when working on transformers (Brown Dep. 78:8–12 (PA175)), and they wore protective clothing and took other measures in response (Plaintiffs-SUMF ¶35; GPC-Response ¶35). And even though they did, they often "[still] g[ot] some drops" on the floor. (Brown Dep. 17:16–17 (PA148).)

51

Georgia Power also "obviously knew that [some of its transformers] were non-working," and it knew that many of them had to be opened and their oil-covered parts removed and replaced.  (Westover Dep. 135:13–22, 173:2–3 (PA433, 435).)  And, as its later decision to "limit [its] liabilities" by sending questionnaires to and performing on-site audits of its scrap purchasers demonstrates, it knew that repair operations could result in PCB disposal and therefore liability on its part.  (Plaintiffs-SUMF ¶123; GPC-Response ¶123.)

The district court held that Georgia Power's knowledge made no difference, reasoning that knowledge alone cannot trigger liability and that Consol and PCS had alleged only knowledge based on "Georgia Power's general [transformer] expertise," "not any knowledge as to spills at Ward."  (Entry 1160 at 17.)  To be sure, knowledge *alone* cannot prove intent, especially where disposal incidentally resulted from the sale of a new, useful product.  *See Burlington Northern*, 556 U.S. at 613.  But as Consol and PCS have explained, when *Burlington Northern* and *Pneumo Abex* are properly applied, this case is not just about Georgia Power's knowledge; each of the other factors cut in their favor as well.

Moreover, the district court's distinction between general and specific knowledge makes little sense.  Whether from firsthand observation or from industry practices, Georgia Power knew Ward would have to open up PCB-laden transformers and dispose of PCB-soaked materials to repair its transformers.  It

52

should not escape liability just because it refused to look closely at its buyers'

practices.  *See, e.g., Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 682–

83 (3d Cir. 2003) ("it is fair to rely" on general awareness of environmental

hazards in the industry rather than particular knowledge of the plant's practices).

### F.    Georgia Power Indicated Its Intent to Dispose by Selling Its Scrap Transformers in Lots, As-Is, with No Warranty Except Title.

The specific circumstances surrounding Georgia Power's scrap sales, as well

as the terms and conditions of those sales, further demonstrate Georgia Power's

intent to discard PCBs.  Georgia Power acted like someone trying to get rid of

unwanted material.  As explained above, it required bidders to make offers on

entire lots rather than particular transformers (Plaintiffs-SUMF ¶88), and its

purchasers took the transformers with only a warranty of title (Plaintiffs-SUMF

¶89; GPC-Response ¶89).  And Georgia Power sold transformers to the highest

bidder regardless of the buyer's business.  (Plaintiffs-SUMF ¶¶88–89; GPC-

Response ¶88; Plaintiffs-Response ¶26.)

Georgia Power contended below that the circumstances surrounding its sales

actually demonstrate it did not intend to dispose of PCBs through those sales.  It

noted that it generally disposed of PCB Transformers and their oil, as well as its

PCB-Contaminated Transformers and their oil, through licensed disposal facilities.

(Plaintiffs-SUMF ¶¶58(a), 67; GPC-Response  ¶¶58, 67; Plaintiffs-SUMF ¶68;

GPC-Response ¶68).  Georgia Power thus contended that when it actually wanted

to dispose of PCBs, it chose that method, not scrap sales like the ones at issue here. (Entry 899 at 20–22.)

This argument ignores the regulatory constraints Georgia Power faced in getting rid of its PCB-tainted materials.  For instance, the Toxic Substances Control Act and implementing regulations prohibited it from scrapping its PCB Transformers or their oil.  (40 C.F.R. § 761.20 (1983).)  It had slightly more flexibility with PCB-Contaminated items, but not much.  *See, e.g.*, 40 C.F.R. § 761.60(a)(2) (1983) (PCB-Contaminated oil could be disposed of in regulated incinerators, landfills, or high-efficiency boilers); *see generally* 40 C.F.R. § 761 (1983).  Because PCB-Contaminated transformers were highly regulated, there was little market for them anyway.  (Westover Deposition 67:2–6 (T&R Electric Supply, another transformer rebuilder, did not repair and sell PCB-Contaminated transformers after the 1979 regulations went into place).)

Georgia Power's "choice" to sometimes arrange for disposal through licensed vendors was thus no choice at all.  It simply did what it said it would: "dispos[e] of surplus, obsolete or damaged distribution line transformers" "to the best advantage of the company."  (1974 Policy at 1, 3 (PA503, 505).)  Where it had no alternative, it paid a licensed disposal vendor.  But where it could save or even make some money—disposing through vendors was not cheap (Plaintiffs-SUMF

¶122; GPC-Response ¶122)—it did so. Georgia Power should not be immune because it could sometimes benefit from its disposals.

Viewed through the lens of *Burlington Northern* and *Pneumo Abex*, the undisputed facts show that Georgia Power intended in part to dispose of PCBs when it scrapped its transformers to Ward. This Court should reverse the district court's contrary conclusion and remand for consideration of the other elements of arranger liability. At the very least, there is a genuine issue of fact about whether Georgia Power intended to dispose of PCBs through its sales.

## III.    SAVANNAH ELECTRIC INTENDED IN PART TO DISPOSE OF PCBs WHEN IT SOLD ITS OLD, OBSOLETE TRANSFORMERS.

Georgia Power has also assumed liability for Savannah Electric's sales to EECNY, Ward's joint venturer. Because Savannah Electric's transformers functioned when sold but required rebuilding to new voltage configurations in order to be marketable to any end user (Plaintiffs-SUMF ¶128; GPC-Response ¶128), they present a somewhat different issue than Georgia Power's scrap transformers. But under the fact-intensive inquiry called for by *Burlington Northern* and *Pneumo Abex*, the evidence demonstrates that Savannah Electric primarily intended to get rid of obsolete equipment, including the PCBs inside them and the potential liability associated with those PCBs.

Savannah Electric saw itself as part of the "vanguard in getting rid of PCBs" in the 1970s and 1980s and wanted to "eliminate the liability" they could create.

55

(Tennille Dep. 15:5–6, 11–12 (PA395).) The prices EECNY paid for some of the transformers demonstrate Savannah Electric's recognition that no one saw much value in them and that Savannah Electric would take any price just to get rid of them. Many had unique utility voltage configurations and, as a result, had to be rewound to be marketable for any industrial use. For example, EECNY paid under a dollar per KVA for one set of technically working transformers (Plaintiffs-SUMF ¶135), less than what Ward paid for faulty, scrap transformers (Plaintiffs-SUMF ¶94; GPC-Response ¶94 (Ward paid $1.02 per KVA for transformers labeled "scrap" by Georgia Power and "FAULTY" by Ward)). In keeping with their undesirability as initially sold, Ward changed their voltages through rewinding in order to meet the market's demands, selling them as "COMPLETELY REBUILT." (Plaintiffs-SUMF ¶135.) For some transformers that Ward did not have to reconfigure, it still had to perform significant repairs such as baking out coils and replacing parts, a process that required Ward to drain the oil and completely disassemble the transformers. (Plaintiffs-SUMF ¶137.)[15] Savannah Electric was indifferent to what would be done with its obsolete, PCB-tainted transformers.

Savannah Electric's transformers were a far cry from the new, unused, useful product at issue in *Burlington Northern* and the entirely reused bearings

---

[15] Consol and PCS have not alleged that transformers on which Ward performed no work before reselling—that is, that were reused in their entirety under *Pneumo Abex*—trigger arranger liability.

from *Pneumo Abex*.  At the least, Consol and PCS have thus raised a genuine issue of fact about Savannah Electric's intent, precluding summary judgment.

## IV. THE PCB-LACED RESIDUAL OIL AND OIL-COATED PARTS INSIDE GEORGIA POWER'S TRANSFORMERS WERE "WASTES," FURTHER DEMONSTRATING GEORGIA POWER'S INTENT TO DISPOSE AND ITS STATUS AS AN ARRANGER.

As this Court has intimated, *see Pneumo Abex*, 142 F.3d at 774–75; *Nurad*, 966 F.2d at 845–46, CERCLA is not the only statute that speaks to whether a seller arranged for the disposal of hazardous substances.  Instead, CERCLA borrows RCRA's definition of "disposal," *see* 42 U.S.C. § 9601(29), imposing liability on those who arrange for the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste . . . so that such solid waste or hazardous waste . . . may enter the environment . . . ," 42 U.S.C. § 6903(3).  As defined, a disposal involves a waste.  RCRA defines "solid waste" as "any garbage, refuse, sludge . . . and other *discarded material* . . . ."  42 U.S.C. § 6903(27) (emphasis added).  By incorporating RCRA's definition of disposal into CERCLA, Congress made clear that arrangements involving discarded materials containing or consisting of hazardous substances are subject to the strict liability provisions of CERCLA.  *See Pneumo Abex*, 142 F.3d at 774.

Given this interplay between CERCLA's and RCRA's definitions, courts have looked to RCRA in determining whether the material at issue was a waste for purposes of CERCLA's definition of disposal.  *See, e.g.*, *Catellus*, 34 F.3d at 750–

57

52 (examining RCRA and its accompanying regulations in holding seller of spent

batteries liable as an arranger).  In *Nurad*, this Court reviewed RCRA cases and

regulations in determining that a CERCLA disposal had occurred when the

material in question was abandoned and not used again, *see* 966 F.2d at 845–46,

and in *Pneumo Abex* it emphasized RCRA's definition of "treatment," which like

the definition of "disposal" requires that the material at issue be a waste, in

concluding that arranger liability exists where the seller "discard[s] hazardous

substances," not where it "s[ells] . . . valuable materials," 142 F.3d at 775; *see id.*

at 774–75.

Following this approach, the PCB-tainted oil and oil-coated broken parts

within Georgia Power's transformers are wastes under RCRA, demonstrating both

Georgia Power's intent to dispose the parts and oil and its status as an arranger

under § 9607(a)(3).  Under the regulations that flesh out RCRA's definition of

"solid waste," "discarded material" includes "[a]bandoned" objects—ones that are

"[d]isposed of," "[b]urned or incinerated," or "[a]ccumulated, stored, or treated . . .

before or in lieu of being . . . disposed of, burned, or incinerated."  40 C.F.R.

§ 261.2(a)(2)(i)(A), 261.2(b).  The residual PCB-tainted oil and the broken, PCB-

laced parts fall comfortably within the category of abandoned, discarded material.

As explained above, Georgia Power left the worthless residual oil in place,

abandoning it for Ward to deal with when repairing and reconfiguring the

transformers.  The broken, PCB-tainted parts were also abandoned, as neither Georgia Power nor anyone else had any use for them other than as scrap metal (*e.g.*, Plaintiffs-SUMF ¶43; GPC-Response ¶43), and both Georgia Power and Ward knew that they would have to be removed, replaced, and discarded to make the transformers operational (*e.g.*, Westover Dep. 135:13–22, 173:2–3 (PA433, 435).).  These abandoned materials became "part of the waste disposal problem" for RCRA purposes, *Owen Elec. Steel Co. of S.C., Inc. v. Browner*, 37 F.3d 146, 150 (4th Cir. 1994), and their status as wastes under RCRA further illustrates Georgia Power's intent to dispose and its status under CERCLA as an arranger.

## CONCLUSION

For the foregoing reasons, this Court should hold that Georgia Power arranged for the disposal of PCBs through its sales, reverse the district court's contrary determination, and remand for consideration of the other elements of arranger liability.  At the very least, the district court's grant of summary judgment to Georgia Power should be reversed and the case remanded for trial.

## REQUEST FOR ORAL ARGUMENT

Given the complexity of the CERCLA issue presented in this case and the importance of this test case to pending claims in the underlying litigation, Consol and PCS respectfully request oral argument.

Respectfully submitted,

/s/ Daniel M. Darragh

Daniel M. Darragh
Julie W. Vanneman
COHEN & GRIGSBY, P.C.
625 Liberty Avenue
Pittsburgh, PA  15222
(412) 297-4900
ddarragh@cohenlaw.com
jvanneman@cohenlaw.com


*Counsel for Plaintiff—Appellant
Consolidation Coal Company*

/s/ Brian J. Murray

Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
(312) 782-3939
bjmurray@jonesday.com

Michael H. Ginsberg
Mary Beth Deemer
JONES DAY
500 Grant Street Suite 4500
Pittsburgh, PA  15219
(412) 391-3939
mhginsberg@jonesday.com
mbdeemer@jonesday.com


*Counsel for Defendant—Appellant
PCS Phosphate Company, Inc.*

Dated:  August 23, 2013

### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 13-1603          **Caption:** Consolidation Coal Company v. Georgia Power

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☑ this brief contains ____**13,926**____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 [*identify word processing program*] in 14-point Times New Roman [*identify font size and type style*]; **or**

   ☐ this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Brian J. Murray
Attorney for PCS Phosphate Co., Inc.
Dated: 8/23/2013

## CERTIFICATE OF SERVICE

I certify that on August 23, 2013, the foregoing PRINCIPAL PAGE-PROOF

BRIEF OF APPELLANTS CONSOLIDATION COAL COMPANY AND PCS

PHOSPHATE COMPANY, INC. was filed on the CM/ECF system, which served

the document on all parties or their counsel.


*s/ Brian J. Murray*
Brian J. Murray

*Counsel for Defendant-Appellant
PCS Phosphate Company, Inc.*